FILED
**United States Court of Appeals
Tenth Circuit**

**November 30, 2023**

**Christopher M. Wolpert
Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

WATCHOUS ENTERPRISES, LLC,

    Plaintiff - Appellee,

v.

WILLIAM J. MOURNES; KENDRA
DUVAL, as personal representative for the
Estate of Gordon W. Duval; CHARLES A.
ELFSTEN; MARK M. HASEGAWA;
MARK S. ZOUVAS,

    Defendants - Appellants,

and

PACIFIC NATIONAL CAPITAL;
WATERFALL MOUNTAIN USA LLC;
WATERFALL MOUNTAIN LLC;
WATERFALL INTERNATIONAL
HOLDINGS LIMITED,

    Defendants.

No. 22-3071

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:16-CV-01432-DDC)**
_____

Jeffrey R. King, Crossroads Legal Solutions, Westwood Hills, Kansas, for Defendants - Appellants.

Shane A. Rosson (James A. Walker with him on the brief), Triplett Woolf Garretson, LLC, Wichita, Kansas, for Plaintiff - Appellee.
_____

Before **HOLMES**, Chief Judge, **HARTZ**, and **CARSON**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Five individual defendants (Appellants) appeal the judgments against them on a variety of claims brought by Watchous Enterprises, LLC. Appellants were associated with companies that Watchous hoped would fund or help find funding for its oil and gas operations. [1]

In 2016 Watchous contracted with one of the companies, Pacific National Capital, paying it a $7,600 nonrefundable deposit to secure help finding a lender or a joint-venture partner. Pacific introduced Watchous to companies affiliated with Waterfall Mountain LLC. We will refer to all those affiliated companies, individually and collectively, as Waterfall. Watchous and Waterfall eventually executed a letter of intent to enter into a joint venture to which Waterfall would contribute more than $80 million. As part of the arrangement, Watchous paid Waterfall a $175,000 refundable deposit. Waterfall said that it would fund the venture through proceeds of loans backed by billions of dollars in Venezuelan sovereign bonds in the name of Waterfall or its lender (RPB Company). But Waterfall never funded Watchous, and Watchous was never refunded the $175,000.

---

[1] Original defendant Gordon Duval died after this litigation commenced and the personal representative of his estate, Kendra Duval, has been substituted as a defendant-appellant. For simplicity, we do not distinguish between the personal representative and the original defendant in this opinion.

Watchous filed suit in the United States District Court for the District of Kansas, bringing claims under the federal Racketeer Influenced and Corrupt Organizations Act (RICO) and common-law claims under Kansas law against Pacific and Waterfall as well as against the five Appellants sued individually. We consider only the claims against Appellants.

The district court granted partial summary judgment in favor of Watchous on its fraud claims (leaving damages for the jury to decide), essentially on the ground that Appellants misrepresented and failed to disclose "the historic and contemporary facts about Waterfall's dubious finances, loan defaults, and consistent lack of success in funding similar projects."[2] *Watchous Enters., LLC v. Pac. Nat'l Cap.* (*Watchous I*), No. 16-1432-JTM, 2020 WL, 1233753 at *36 (D. Kan. Mar. 13, 2020). Watchous's remaining claims proceeded to trial, where a jury found that Appellants

---

[2] Applying Kansas law, the parties and the district court distinguished between claims of fraud and claims of fraud by silence. The elements of fraud by silence in Kansas are: "(1) The defendant had knowledge of material facts that the plaintiff did not have and could not have discovered by the exercise of reasonable diligence; (2) the defendant was under an obligation to communicate the material facts to the plaintiff; (3) the defendant intentionally failed to communicate to the plaintiff the material facts; (4) the plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff; and (5) the plaintiff sustained damages as a result of the defendant's failure to communicate the material facts to the plaintiff." *Stechschulte v. Jennings*, 298 P.3d 1083, 1097 (Kan. 2013). For purposes of this appeal, we need not distinguish between the two types of fraud. Indeed, other jurisdictions use the rubric *fraud* to describe causes of action like fraud by silence. *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 9 cmt. c, § 13 (Am. L. Inst. 2020). Appellants argue that the fraud-by-silence cause of action was not raised in district court but they ignore that it is clearly raised in the pretrial order that governed the case.

had engaged in a civil conspiracy to defraud Watchous and had violated RICO, 18 U.S.C. § 1962(c) and (d). The jury awarded compensatory and punitive damages.

On appeal Appellants raise three challenges to the judgment below. First, they argue that the district court improperly granted summary judgment on the fraud claims. Among other arguments, they contend that summary judgment was improper because the evidence against them did not meet the exacting standard for granting summary judgment to a plaintiff in a fraud case, where the intent of the defendants is an element of the claim. Second, they argue that the court abused its discretion by improperly using Fed. R. Civ. P. 56(g) to deem facts established for purposes of trial. Third, they argue that the court improperly granted Watchous's motions in limine to exclude evidence contrary to those established facts, evidence that Watchous had unsuccessfully tried to obtain loans from more than 120 banks, and evidence of the poor financial condition of several Appellants. Because we reject the second and third arguments, we must affirm the jury verdict. We therefore need not address the propriety of summary judgment, because reversal of the summary judgment would not affect the damages awards to Watchous. Exercising jurisdiction under 28 U.S.C. § 1291,[3] we affirm.

---

[3] On review of this case in preparation for oral argument, we noted that the district court had not entered judgment on several claims, so there was no appealable final judgment before us. *See Banner Bank v. Smith*, 30 F.4th 1232, 1237–38 (10th Cir. 2022) ("To be final, a district court's decision must reflect the termination of all matters as to all parties and causes of action." (internal quotation marks omitted)). We therefore abated the appeal and remanded the matter to the district court to address the unresolved claims. That court having done so, we acquired appellate jurisdiction.

## I.     BACKGROUND

### A.     Factual Background

The following facts are uncontroverted. Watchous engages in oil and gas exploration and production. Klee Watchous is its managing member.[4]  On May 30, 2016, Watchous contacted Pacific, a company that looks for financing for oil and gas ventures, to seek a loan or a joint-venture partner to finance its operations. Appellants Charles Elfsten and Mark Hasegawa, both Pacific officers, emailed and spoke with Watchous, stating that they would be interested in representing it and had in mind a fund, which they called "our fund," that could finance a joint venture. Aplee. App. 140, 145. The fund referred to was Waterfall.

On June 4, 2016, Watchous entered into two agreements with Pacific, one hiring Pacific to find it a lender and the other hiring it to find a joint-venture partner. In accordance with the terms of the joint-venture placement agreement, two days later Watchous wired Pacific a "non-refundable processing/underwriting fee" of $7,600. Aplee. App. at 116. Under that agreement Pacific would receive a success fee—3% of the gross proceeds provided by the joint-venture partner—should Watchous enter into a joint venture with Waterfall.

Waterfall was a group of companies that provided "funding and partner syndication" for energy, natural-resource, technology, and real-estate projects. Aplts.

---

[4] We use *Watchous* to describe the company and its employees. (For example, we say that correspondence sent to a Watchous employee or officer was sent to *Watchous*.) When relevant, we use *Klee Watchous* in describing acts taken by Klee Watchous himself.

App., Vol. II at 216. Its officers and agents included Appellant William Mournes, Waterfall's managing director; Appellant Gordon Duval, Waterfall's in-house counsel and assistant managing director; and Appellant Mark Zouvas, a Waterfall consultant and potential business partner. Waterfall said it intended to fund Watchous's project using $2.4 billion in Venezuelan sovereign bonds purchased beginning in 2014. The bonds were said to be "blocked in favor of" Waterfall or its lender, RPB Company, for one year and one month, Aplee. App. at 241, 258; and Waterfall was said to have a beneficial interest in the bonds. But, as Watchous later learned after the transaction fell through, the bonds could only be used as collateral for a loan and the Venezuelan Central Bank had to approve any transaction.

Although Pacific negotiated on Watchous's behalf with companies other than Waterfall, Waterfall appeared to be the favorite. Elfsten stated in an email sent after this litigation commenced that he had "[v]erbally told [Watchous] [he had] known Bill Mournes for 30 years and ha[d] been involved in prior transactions" with him. *Id.* at 364. Asked for advice regarding a potential deal with Beal Bank, Elfsten told Watchous that the bank might be Watchous's cheapest joint-venture option, though "our [joint venture fund, Waterfall] would be great." *Id.* at 143. Hasegawa continued to refer to Waterfall as "our fund." *Id.* at 121, 136, 137, 140, 145, 147, 150.

The Pacific officers represented that Waterfall was a successful enterprise. In early June 2016 Hasegawa, with Elfsten copied on the message, informed Watchous that Waterfall "bring[s] in about $10 billion a year." *Id.* at 113. Later that month he added that Waterfall "generally want[ed] [projects] $10 million and up." *Id.* at 135.

6

On July 18 he sent Watchous a message, with Elfsten copied, claiming that "our fund [Waterfall] is closing on two more bonds this month worth $2.4 billion." *Id.* at 147. On July 19 Hasegawa reported to Watchous that he and Elfsten had spoken with "our fund manager Bill [Mournes]" and reported that Waterfall would "probably" be able to fund "a big part of" Watchous's proposed joint venture—which contemplated an $80 million buy-in for half of Watchous—"from funds he has coming the end of this month." *Id.* at 145.

On July 25 and 26, 2016, Hasegawa emailed Watchous the terms of Waterfall's offer. Elfsten, Zouvas, Duval, and Mournes were copied on the correspondence. Waterfall, Hasegawa said, was "in agreement to do a 50/50 total joint venture" with Waterfall providing $80 million by November 17. *Id.* at 151. For its part, Watchous was to make a refundable deposit of $175,000 to Waterfall.

With a deal on the table, several Appellants gave Watchous further information regarding Waterfall's financial health. On July 26 Hasegawa assured Watchous that Waterfall was "in good standing" in the United States and internationally, and that it had checking accounts at four major U.S. financial institutions. *Id.* at 235–36. On July 27 Mournes discussed the deal over lunch with Watchous representatives. On July 28 Elfsten forwarded Watchous a statement from a Venezuelan bank that portrayed Waterfall as having $599,970 in an account there. On July 29 Klee Watchous asked Elfsten to vouch for Waterfall before he sent the $175,000 deposit. Elfsten vouched for Waterfall and its ability to repay the deposit.

7

Zouvas also provided information after the July 27 meeting between Mournes and Watchous. Copying Duval and Mournes, he sent Klee Watchous an unsigned promissory note for the $175,000; documents from a supposed prior deal that were "representative of the type of deal we would structure"; and "copies of our bonds [held in Venezuelan banks]." *Id.* at 152, 238. In addition, Duval responded to Klee Watchous's request that Waterfall "send references of those with whom you have done similar joint ventures," *id.* at 458, by providing a list of six references. (Waterfall conceded at summary judgment that four of the references were owed money by Waterfall, and a fifth was a Waterfall agent who also served on its executive committee.)

Shortly after Duval sent the list of references, Mournes circulated the final Letter of Intent to enter into a joint venture, signed by him and Klee Watchous. It provided that Waterfall would "contribute cash" to the joint venture amounting to $81.2 million, beginning on or before August 17, 2016, and culminating by November 17, 2016. *Id.* at 464. Waterfall and Watchous would each pay half of a $2.4 million finder's fee to Pacific. And Watchous would make "an advance refundable deposit to Waterfall" of $175,000, *id.* at 448, which Waterfall would return "upon the earlier of the Closing [on August 17]" or termination of the Letter of Intent. *Id.* at 467. Early the next day, July 29, Waterfall sent Watchous a message noting that "[Mournes] and [Duval] expect[ed] the funding to occur in early August." *Id.* at 913. Watchous deposited the $175,000 with Waterfall that day.

8

Though they had not conveyed this information to Watchous, Elfsten and Hasegawa knew that Waterfall was far from financially strong. Watchous's motion for summary judgment named, without dispute from Waterfall, eight prospects brought to Waterfall by Pacific that Waterfall was unable to fund. Further, in response to Watchous's discovery requests, Elfsten produced a list of projects that Pacific brought to Waterfall between May 2013 and July 28, 2016, the day Watchous and Waterfall finalized the Letter of Intent. Elfsten admitted that "[n]one of the potential projects on the list," one of which was a project with Zouvas's company, "closed a transaction with Waterfall." *Id.* at 1045. And in a July 20 email, Elfsten, after pitching the Watchous project to Mournes, with Hasegawa copied, added, "Hope things are going better for you today, wish we had the money to help you." *Id.* at 425.

Mournes, Zouvas, and Duval also knew that Waterfall was struggling. On the evening of July 29, Duval wrote a message with the subject line "Great News -- the Wire [from Watchous] Was Sent." *Id.* at 470. He explained that upon receiving Watchous's deposit he had immediately forwarded $160,000 of the sum to a business partner, who would use the money to ensure that funds from the bonds were transferred to Waterfall. Duval added that "most of our crew are pretty well tapped out because this has been such a long and difficult process that none of us could have anticipated." *Id.* at 471. He wrote that the arrival of Watchous's money was "literally a miracle" but that Waterfall would still have to "pass the hat" for funds for travel and operational costs. *Id.* Mournes responded, "THANK YOU GENTLEMEN. . .

9

GAME ON." *Id.* at 470. Elfsten replied to Mournes, copying Hasegawa and Zouvas, to note his expectation that Watchous's deposit was to have gone to the bank.

Waterfall never funded Watchous. On August 23, 2016, Klee Watchous asked Elfsten and Hasegawa to reengage with Beal Bank. On September 8, 2016, Watchous terminated the Letter of Intent and demanded—with no result—return of the $175,000 deposit. In December 2016, Watchous filed suit.

### B.     Procedural History

In April 2017 the parties agreed to settle the case on the understanding that Waterfall would pay Watchous $175,000 in scheduled installments. But no payment was made, and in July 2018 Watchous filed a Second Amended Complaint against Appellants, Pacific, and Waterfall, bringing claims of fraud, breach of contract (a later-abandoned claim based on the settlement discussions), breach of fiduciary duty, civil conspiracy to commit fraud, and RICO violations. In August 2019 the court issued a pretrial order summarizing and refining claims made in the complaint. The pretrial order also authorized a crossclaim for indemnification brought against Waterfall by Pacific and the Pacific officers.

All parties moved for partial or complete summary judgment. Watchous's motion for partial summary judgment appended a statement of 369 facts it contended were uncontroverted. Pacific, Elfsten, and Hasegawa jointly responded to each fact, denying some outright and disclaiming knowledge of, contesting in part, or acceding to others. Waterfall, Mournes, Duval, and Zouvas jointly responded to only 17 facts, contesting each. The district court granted Watchous summary judgment on its fraud

claims against Appellants and its breach-of-fiduciary-duty claim against Pacific. *See Watchous I*, 2020 WL 1233753, at *36–39, 41. The court set the issue of damages on these claims for trial. The civil conspiracy-to-defraud and RICO claims were also to be resolved at trial.

Watchous submitted a pretrial motion asking that the district court use Fed. R. Civ. P. 56(g) to deem established for purposes of trial all facts listed in its motion for partial summary judgment that were not genuinely in dispute. The court granted the motion, determining to "issu[e] an instruction to the jury that it should deem certain facts established," and providing that "the instruction shall be taken from the court's factual findings in the [Summary Judgment] Order—modified in certain limited instances and to remove the court's evaluation of competing factual and legal arguments." *Watchous Enters., LLC v. Pac. Nat'l Cap.* (*Watchous II*), No. 16-1432-JTM, 2020 WL 6078170, at *4 (D. Kan. Oct. 15, 2020). After the close of evidence the court issued a supplement to the jury instructions that required the jury to accept 295 facts as undisputed, consistent with the rulings in the summary-judgment order and adopting language from the facts appended to Watchous's motion for partial summary judgment. About two-thirds of the facts summarized (193) were grouped into sections about 12 projects of different companies for which Pacific and Waterfall had indicated they could provide funding but failed to perform. One finding listed 56 funding agreements executed by Pacific for which it had received a fee but obtained no funding from Waterfall. Another finding listed dozens of unpaid notes owed by Waterfall. Eighty-three findings related to Watchous's dealings with Pacific and

11

Waterfall; the great bulk of these findings quote, summarize, or describe documents such as emails, financial transactions, and agreements.

The jury found each of the Appellants liable on Watchous's RICO and civil conspiracy-to-defraud claims. It assessed compensatory damages on these claims as well as on Watchous's fraud claims against Appellants. The jury awarded against each Appellant the maximum amount of compensatory damages permitted by the instructions, which said: "Plaintiff claims actual damages in the amount of $182,600 against all defendants. This figure comes from the $7,600 placement fee plaintiff paid to Pacific National Capital and the $175,000 refundable deposit plaintiff paid to Waterfall." Aplts. Supp. App. at 990. On the RICO claim, the RICO conspiracy claim, and the civil conspiracy claim, $182,600 was awarded against each Appellant. On the fraud claims, $182,600 was awarded against Elfsten and Hasegawa and $175,000 against Mournes, Zouvas, and Duval (who were not directly involved in the $7,600 deposit to Pacific). The jury further found, with respect to the fraud claim and the civil conspiracy-to-commit-fraud claim, that punitive damages should be assessed against each Appellant. The amount to be awarded in punitive damages was then tried to the jury, which awarded $1 million against Mournes and Elfsten, $500,000 against Hasegawa and Zouvas, and $250,000 against Duval. Also, in accordance with RICO, 18 U.S.C. § 1964(c), the judgment awarded an additional amount equal to twice the compensatory damages ($365,200) against each Appellant.

## II.     DISCUSSION

The damages awarded against Appellants on the fraud claims resolved by partial summary judgment were identical to or less than the damages awarded on the civil-conspiracy claims resolved at trial. The compensatory damages were based on the amounts of the placement fee and the refundable deposit paid by Watchous to Pacific and Waterfall respectively. And the punitive-damages awards did not distinguish between the fraud claims and the conspiracy claims. Because, as the district court's judgment recognized, the damages awards for fraud and for civil conspiracy duplicate one another, Appellants would gain no monetary advantage if we were to set aside the partial summary judgments of liability on the fraud claims. They would be liable for the same damages regardless. Accordingly, if we reject all of Appellants' challenges on appeal to the conduct of the trial, there is no need for us to address the challenges to the partial summary judgment. *See Combs v. Shelter Mut. Ins. Co.*, 551 F.3d 991, 1000 (10th Cir. 2008) ("While we believe Plaintiff's fraud allegations do not likely warrant submission to the jury, we need not decide the matter because Plaintiff already received damages for Defendants' breach of contract and is not entitled to double recovery under a fraud theory."). For this reason, we turn first to Appellants' challenges to the trial. Because we see no reversible error at trial, we decline to examine the propriety of the partial summary judgments.

Appellants raise three challenges to how the case was tried to the jury: (1) even if facts had not been contested at summary judgment, there were general reasons why it was improper for the district court to instruct the jury under Rule 56(g) that

13

those facts were established; (2) the court incorrectly found that certain disputed facts were undisputed; and (3) the court incorrectly ruled on several motions in limine. We reject all three challenges.

### A.    General Objections to Use of Rule 56(g)

Watchous moved for partial summary judgment on the issue of liability on its fraud, civil conspiracy, and RICO claims against Appellants. The district court granted partial summary judgment on the fraud claims but determined that there were genuine issues of material fact precluding partial summary judgment on the civil-conspiracy and RICO claims. Watchous then moved under Fed. R. Civ. P. 56(g) for an order stating that a number of facts uncontested in the summary-judgment proceedings should be treated as established for purposes of the trial on the remaining claims. The court granted the motion, stating that it would issue an instruction to the jury telling it to deem certain facts established. The instruction listed 295 facts. The parties agree that our review of the instruction is for abuse of discretion. Appellants have shown no abuse of discretion.

Appellants' first general challenge to the facts-established instruction is that the facts they did not controvert during summary-judgment proceedings were conceded only for the purpose of summary judgment—not for any later stage of the litigation. This, they say, is the default presumption under District of Kansas Local Rule 56.1(a), which provides, in relevant part, "All material facts set forth in the statement of the movant will be deemed admitted *for the purpose of summary judgment* unless specifically controverted by the statement of the opposing party."

14

(emphasis added).[5] Appellants construe this language to mean that the uncontroverted facts can be used *only* for ruling on the summary-judgment motion. But no language in the Rule explicitly prohibits other use of the uncontroverted facts. And, more importantly, if the Rule said that, that portion of the Rule would be invalid as contrary to Fed. R. Civ. P. 56(g), which states: "If the court does not grant all the relief requested by the motion [for summary judgment], it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." *See Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002) ("[D]istrict courts must construe and apply local rules in a manner consistent with Fed. R. Civ. P. 56"); Fed. R. Civ. P. 83(a)(1) ("A local rule must be consistent with" the federal rules.).

To be sure, the nonmovant is entitled to admit a fact solely for the purpose of resolving the summary-judgment motion. It may think there is no point in wasting time and energy on a factual issue because it can prevail even if that particular fact is

---

[5] Rule 56.1(a), titled "Motions for Summary Judgment," reads in full:

> Supporting Brief. The brief in support of a motion for summary judgement must begin with a section that contains a concise statement of material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies. All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.

15

not disputed. *See* Steven S. Gensler & Lumen N. Mulligan, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 56. Summary Judgment (2023 ed.) ("Parties often elect not to contest certain facts for purposes of summary judgment only. In that event, an order establishing those facts would be inappropriate."). As stated in the Fed. R. Civ. P. 56 advisory committee's note to the 2010 amendment to subdivision (g):

> The court must take care that this determination does not interfere with a party's ability to accept a fact for purposes of the [summary-judgment] motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes.

But that does not mean a party can sit close-lipped when the court is considering the use of Rule 56(g) and assume that it is protected by an irrebuttable presumption that the use of admissions is always limited to the summary-judgment proceeding. The party opposing an order establishing facts under Rule 56(g) must either present evidence controverting the proposed facts or persuade the district court that it would be unfair or otherwise inappropriate to establish particular facts through that process. *See id.* (A court "may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial . . .[; or it] may

16

conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.").[6]

Appellants' briefs on appeal briefly allude to these concerns about overusing Rule 56(g), but the briefs speak only in generalities. They do not explain how these general concerns apply in this case. Indeed, the opening comments at oral argument by Appellants' counsel may explain why the district court chose to vigorously apply Rule 56(g). Counsel said:

> I will start with what makes this case a little bit unusual for a fraud case on appellate review. There are very few material facts that are in dispute in the fraud case. . . . There are only about a half-dozen issues or questions of fact on the fraud claims, and those are very carefully described in Appellants' briefs. Those disputed facts, though—and probably more appropriately, the disputed inferences made by the district court on those facts—are dispositive in two points: on the issue of intent and the issue of justifiable reliance.

---

[6] We note that Appellants' Reply Brief endorses this view of Rule 56(g), stating that it reads the Local Rule to say that "a Rule 56(g) motion could follow a summary judgment order, thereby providing a non-movant the opportunity to contradict allegations that it deemed irrelevant for its summary judgment position." Reply Br. at 13. They go on to contend, however, that the district court did not permit them "to present evidence controverting these allegations to ensure preservation of controverted facts for trial." *Id.* at 14. The record belies this contention. In response to Watchous's request to have facts deemed undisputed under Rule 56(g), Appellants argued that certain proposed undisputed facts were in fact disputed, largely repeating arguments made in response to the summary-judgment motion. Their responses did not contend that they needed further time for discovery or otherwise to enable them to adequately respond to the request. Of course, they can still argue that various proposed undisputed facts were actually disputed, and they do so in their appellate briefing.

Oral Arg. at 00:38–01:19. In keeping with this remark, Appellants' specific objections in their appellate briefs concern just a few of the facts.[7] We now turn to their arguments on appeal regarding allegedly controverted facts.

### B.    Allegedly Disputed Facts

Appellants devote only a few pages of their opening brief to challenging the facts established by the district-court order. Their brief lists each of the facts they disputed in response to the motion for summary judgment. But "[w]e do not consider merely including an issue within a list to be adequate briefing," and "[i]ssues will be deemed waived if they are not adequately briefed." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) (cleaned up). Thus, Appellants have waived their global objection to the establishment of any fact they disputed below.

Appellants' specific arguments are limited to three issues they say are among the "most egregious examples" of the court's abuse of discretion. Aplts. Br. at 29. These are the court's establishment of Watchous's Facts 5, 280, and 291, insofar as they addressed "Appellants' knowledge of the ownership of the Venezuelan bonds," *id.* at 30; Facts 87, 146, 195, and 234, regarding Waterfall's failure to fund any

---

[7] Although to resolve this appeal we need address only Appellants' specific arguments, and although district courts have considerable discretion in their use of Rule 56(g), we should add that we do have reservations about what the district court did here. In large part we can see that what the court did was both fair and efficient in presenting documentary evidence of transactions without the need for a parade of witnesses. But some of the findings arguably go beyond objective characterizations of documents and include inferences that should be made by a jury, even though they were quite reasonable. This opinion should not be read as an endorsement of rulings by the district court that have not been adequately challenged on appeal.

previous Pacific clients; and Fact 231, regarding whether the references Duval sent Watchous were people with whom Waterfall had conducted prior successful joint ventures.

Fact 5, however, says nothing about Appellants' knowledge; and in any event, was effectively conceded in district court. Fact 5 states:

> Certain bonds were blocked in favor of Waterfall and its lender, RPB Company, to allow them to structure a potential transaction. However, neither owned the bonds absolute. The Banco Central de Venezuela owned the bonds and had to approve the transaction. At all times relevant to Watchous, the bonds could only be used for collateral for a loan.

Aplts. App., Vol. II at 18. In their responses to Watchous's motion for partial summary judgment, Appellants did not dispute that (1) the bonds were blocked in favor of Waterfall and RPB, (2) the Venezuelan Central Bank had to approve all transactions, or (3) the bonds could only be used as collateral. Elfsten and Hasegawa contested Fact 5 only by stating that Waterfall had a beneficial interest in the bonds. And in their responses to Watchous's motion to establish facts for purposes of trial, (1) Elfsten and Hasegawa conceded that Waterfall did not own the bonds absolute: they stated that the parties agreed on the facts regarding bond ownership, and they did not dispute that Waterfall's relationship to the bonds was "ownership with restrictions," Aplts. Supp. App. at 274–75; and (2) the Waterfall individuals stated that Waterfall "own[ed] an interest in the bonds," rather than that Waterfall owned the bonds absolute. *Id.* at 283.

Facts 280 and 291 also do not address Appellants' knowledge. Insofar as they relate to the Venezuelan bonds, they assert only that no one told KRG, another

Pacific client, that Waterfall did not own the bonds. On appeal, Appellants assert that Elfsten and Hasegawa "receiv[ed] assurances" that information regarding Waterfall's beneficial ownership of the bonds was "conveyed directly" to Watchous. Aplts. Br. at 30. But even if true, this assertion is irrelevant to Facts 280 and 291, which concern what *KRG* knew about the bonds. Appellants cite no evidence that KRG knew that Waterfall had a beneficial interest in the bonds. The only record evidence they cite as controverting Facts 280 and 291 is completely irrelevant or concerns what *Watchous*, not KRG, was told about Waterfall's interest in the bonds. Facts 280 and 291 were not in genuine dispute.

As for Facts 87, 146, 195, and 234, which relate to Waterfall's failure to fund projects in the past, Appellants' sole complaint is that the district court "ignore[d] Appellants' controverting evidence that they told [Watchous] about the lack of successful funding, both in conversation and through a July 27, 2016, email." Aplts. Br. at 31. But Facts 87 and 146 say nothing about what Watchous was told; they concern the failure to inform other Pacific clients about Waterfall's prior failures to fund. And even though Facts 195 and 235 do state that Watchous was not informed of Waterfall's funding failures, Appellants provide no contrary evidence. They do not cite to any portion of the record to support their argument except a July 27 email from Zouvas attaching copies of the bonds, and nothing in the email states or suggests that Waterfall had not been able to fund prior projects. Indeed, the email referred to "suites of documents we have created for other deals." Aplts. App., Vol.

20

III at 100. And in a follow-up message sent the same day, Zouvas attached documents purporting to show a transaction between his company and Waterfall.

Finally, the gist of Fact 231 was that "[o]n July 28, 2016, Duval sent Watchous alleged references for Mournes, Duval, and Zouvas. . . . The purported references all have a direct relationship with Waterfall and had a vested interest in Waterfall obtaining funds from Watchous to attempt to close Waterfall's intended bond transaction. . . . No evidence was produced in discovery to suggest that Waterfall completed a successful venture, let alone oil and gas joint venture, with any of the references." Aplts. App., Vol. II at 68. The only attempt at challenging Fact 231 in Appellants' opening brief is the assertion that "Appellants were truthful about their past ventures together, admitting that they had done so, without ever opining on the success of those ventures." Aplts. Br. at 31. But, again, even if this assertion is true, it does not contradict Fact 231. Fact 231, too, was not in genuine dispute.

The district court did not abuse its discretion in establishing the challenged facts for the purpose of trial.

### C.    Motions in Limine

Appellants' last argument objects to the district court's rulings on three of Watchous's motions in limine: (1) a motion, relying on Fed. R. Evid. 403, to prohibit the individual defendants from testifying on matters established in the supplementary instruction incorporating the Rule 56(g) order; (2) a motion to exclude, under Fed. R. Evid. 402 and 403, evidence that Watchous's loan applications had been rejected by more than 120 banks before Watchous contracted with Pacific; and (3) a motion to

21

exclude, under Fed. R. Evid. 402 and 403, evidence of the financial conditions of Elfsten, Hasegawa, Mournes, and Duval. "We review a court's evidentiary rulings for an abuse of discretion, according deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters. This is particularly true with respect to Rule 403 since it requires an on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant." *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1083 (10th Cir. 2010) (cleaned up).

We can easily dispose of the challenge to the motion to exclude testimony contrary to established facts. The challenge is merely a corollary to the challenge to the Rule 56(g) order. The concluding sentence of this argument in Appellants' brief states: "Thus, if the Court finds the Rule 56(g) order was an abuse of discretion, it should also reverse the order granting this motion in limine." Aplts. Br. at 35–36. Because the order was not an abuse of discretion, the order granting the motion in limine was appropriate. (We note that the district court made clear that all in limine rulings were "subject to revision if circumstances convince [the court] it should be revised." Aplts. Supp. App. at 395. Thus, if Appellants came upon evidence contradicting one of the established facts, they could have requested that the evidence be admitted. But they have not pointed to any such request during trial.)

As for the exclusion of evidence that many banks had rejected Watchous's loan applications, we do not understand Appellants' contention that the evidence was relevant at trial. Perhaps the evidence would have been admissible if Watchous were

22

claiming damages because the defendants had not obtained funding for its projects—Appellants could have properly argued that Watchous was not injured by any failure of Appellants to secure funds, because there was no way Watchous could have persuaded anyone to lend it money or enter into a joint venture with it. But the only claims for compensatory damages sought by Watchous were to get back the money it had paid for assistance in obtaining financing. Appellants' other two assertions of relevance also miss the mark. They claim that the evidence of bank rejections would help rebut evidence that they engaged in a pattern of racketeering activity and participated in the conduct of an enterprise through that pattern. But we fail to see how the excluded evidence could disprove, or even soften, the evidence of those elements of the RICO claims.

Finally, Appellants' challenge to the exclusion of evidence of their poor financial condition is based on a mischaracterization of the district court's ruling on the matter. The court agreed with Appellants that evidence of financial condition is admissible in determining the amount of punitive damages. But the court explained that the determination of the amount of punitive damages would be bifurcated from the first part of the trial, which would address liability and compensatory damages, and it properly ruled that evidence of financial condition would not be relevant during that part of the proceeding. As it turned out, after the jury returned its verdict finding that punitive damages should be assessed against all individual defendants, the court explicitly gave Elfsten and Hasegawa a chance to introduce evidence regarding the proper amount of punitive damages. But they did not take advantage of

the opportunity. As for Mournes and Duval, neither they nor their counsel appeared on this day of trial. Zouvas also was not present. We see no abuse of discretion.

In sum, we reject Appellants' challenges to the jury verdict.

### III.    CONCLUSION

Because Appellants have failed to show any error in the conduct of the jury trial, and because the jury verdict renders moot any error in the award of partial summary judgment to Watchous, we **AFFIRM** the judgment of the district court. We **GRANT** Defendants-Appellants' Motion for Leave to Supplement Appendix.